```
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------x

GUY GIULIANO,

                    Plaintiff,              MEMORANDUM & ORDER
                                               20-CV-5603(EK)
          -against-


COMMISSIONER OF SOCIAL SECURITY,

                    Defendant.

-------------------------------------x
```
ERIC KOMITEE, United States District Judge:

Plaintiff Guy Giuliano challenges the Social Security Administration's denial of his claim for disability insurance benefits. Before the Court are the parties' cross-motions for judgment on the pleadings. For the following reasons, I grant the Commissioner's motion and deny Plaintiff's cross-motion.

## I. Background

### A. Procedural Background

In November 2018, Giuliano applied for disability benefits, alleging a disability onset date of December 31, 2014. Administrative Tr. ("Tr.") 127–28, ECF No. 9. The agency denied his claim. *Id.* at 145–68. On January 27, 2020, an administrative law judge ("ALJ"), Seth Grossman, held a hearing on Giuliano's claim; he continued that hearing to June 24, 2020, in order to supplement the record. *Id.* at 51-100, 102-26. The ALJ concluded that Giuliano was not disabled and therefore not

entitled to disability benefits.  *Id.* at 7-22.  The Appeals Council denied Giuliano's request for review of the ALJ's decision, rendering it final.  *Id.* at 1-6.  Giuliano timely sought review of that decision in this Court.  ECF No. 1.

**B.   The ALJ's Disability Evaluation**

Under the Social Security Act, "disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment . . . which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).  The Social Security Administration's regulations require ALJs to follow a five-step sequence in evaluating disability claims.  20 C.F.R. § 404.1520(a)(4).  The claimant bears the burden at steps one through four of the sequential analysis.  *Burgess v. Astrue*, 537 F.3d 117, 128 (2d Cir. 2008).  If the claimant is successful, the burden then shifts to the Commissioner at the fifth and final step.  *See Poupore v. Astrue*, 566 F.3d 303, 306 (2d Cir. 2009).

First, the ALJ determines whether the claimant is engaged in substantial gainful activity.  *Id.* § 404.1520(a)(4)(i), (b).  If not, then at step two, the ALJ evaluates whether the claimant has a "severe impairment" — that is, an impairment or combination of impairments that "significantly limits" his "physical or mental ability to do

2

basic work activities." *Id.* § 404.1520(a)(4)(ii), (c).  If the ALJ identifies a severe impairment, then at step three, he must determine whether it meets or equals one of the impairments listed in Appendix 1 of the regulations — the "Listed Impairments." *Id.* § 404.1520(a)(4)(iii), (d); *see also id.* pt. 404, subpt. P, app. 1.  If it does, the ALJ will deem the applicant disabled.  *Id.* § 404.1520(a)(4)(iii).

Here, ALJ Grossman determined that Giuliano had not engaged in substantial gainful activity since the alleged onset date.  Tr. 12.  The ALJ also determined that Giuliano suffered from the following "severe impairments": degenerative disc disease and bilateral shoulder tear.  *Id.*  Certain impairments, however, did not qualify as severe: these included anxiety, a gambling addiction, and visual impairments with headaches.  *Id.* at 12-13.[1]  In the end, ALJ Grossman determined that none of Giuliano's severe impairments rose to the level of a Listed Impairment.  *Id.* at 13-14.

When the ALJ finds that the claimant has severe impairments that do not meet the requirements of the Listings, he must determine a claimant's residual functional capacity ("RFC").  20 C.F.R. § 404.1520(a)(4)(iv).  The RFC is the most a

---

[1] As discussed below, Giuliano suffers from a degenerative condition of the cornea.

claimant can do in a work setting notwithstanding his limitations. *Id.* § 404.1545(a)(1). The ALJ concluded here that Giuliano had the RFC to perform the full range of "sedentary work," as defined in 20 C.F.R. § 404.1567(a). Tr. 14.

At step four, the ALJ considers whether, in light of the RFC determination, the claimant could perform "past relevant work." 20 C.F.R. § 404.1520(a)(4)(iv), (f). Here, the ALJ found that Giuliano *could* perform his past work as an attorney. Tr. 19-20.[2] The ALJ also concluded, in the alternative at step five, that there were other jobs available in significant numbers in the national economy that he could perform, including as a reception clerk at an attorney's office. *Id.* at 20-21; *see* 20 C.F.R. § 404.1520(a)(4)(v), (g). Given these conclusions, the ALJ determined that Giuliano was not disabled. Tr. 21-22.

## II. Standard of Review

A district court has jurisdiction to review the final judgment of the Commissioner denying an application for Social Security disability benefits. 42 U.S.C. § 405(g). The review is limited to two questions: whether substantial evidence supports the Commissioner's decision, and whether the

---

[2] Giuliano maintained a civil practice as an attorney, but was disbarred in 2012 following his conviction and incarceration for unspecified "white-collar crime[s]." *Id.* at 13, 107-08. Because Giuliano does not assert that the ALJ erred at step four in concluding that he could perform his past work as an attorney — disbarment notwithstanding — the Court does not address this potential issue.

4

Commissioner applied the correct legal standards. *Moran v. Astrue*, 569 F.3d 108, 112 (2d Cir. 2009).

"Substantial evidence means more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Burgess*, 537 F.3d at 127.[3] "[I]f supported by substantial evidence," the Commissioner's factual findings "shall be conclusive." 42 U.S.C. § 405(g).

### III.  Discussion

Giuliano argues that the ALJ's conclusions regarding both his visual and musculoskeletal impairments were not supported by substantial evidence — specifically, because the record "does not support the notion that [he] had the visual and manual capacities to perform" the jobs of attorney or law office receptionist. Mem. of Law in Supp. of Pl.'s Mot. for J. on the Pleadings ("Pl. Mem.") 9, ECF No. 12-1. He also asserts that the ALJ committed legal error by substituting his lay opinion as to these impairments for those of the medical experts. For the reasons explained below, these arguments lack merit.

At the outset, it is worth noting that the *timing* of alleged disability is primarily at issue here. To qualify for

---

[3] Unless otherwise noted, when quoting judicial decisions this order accepts all alterations and omits all citations, footnotes, and internal quotation marks.

disability benefits, "a claimant must establish that [he] became disabled on or before the expiration of [his] insured status." *McDonaugh v. Astrue*, 672 F. Supp. 2d 542, 563 n.22 (S.D.N.Y. 2009); *see* 42 U.S.C. §§ 416(i), 423(c); 20 C.F.R. §§ 404.130, 404.315(a). "Evidence of an impairment that reached disabling severity after the expiration of an individuals' insured status cannot be the basis for a disability determination, even [if] the impairment itself may have existed before the individual's insured status expired." *Norris v. Barnhart*, No. 1-CV-902, 2002 WL 31778794, at *4 (S.D.N.Y. Dec. 12, 2002); *see Arnone v. Bowen*, 882 F.2d 34, 38 (2d Cir. 1989) (plaintiff can prevail only "if his continuous disability began before [his date last insured]").

Here, Giuliano alleged a disability onset date of December 31, 2014, and was last insured for disability insurance benefits on December 31, 2015. Tr. 10, 128. As a result, he must show that he had a disability during that one-year period to qualify for disability benefits. As the ALJ properly concluded, Giuliano failed to do so.

**A. Visual Impairments**

Giuliano first argues that the ALJ lacked adequate record support for the finding that his "visual disorders" were not severe. *See* Pl. Mem. 10. In reaching that conclusion, the ALJ appropriately considered the evidence in the record —

6

including medical reports and the expert opinion of an ophthalmologist — to conclude that Giuliano's impairment was not severe prior to December 31, 2015.  Tr. 12-13.

As noted above, "[a]n impairment or combination of impairments is not severe if it does not significantly limit [the claimant's] physical or mental ability to do basic work activities."  20 C.F.R. § 416.922(a); *see also id.* §§ 404.1520(a)(4)(ii), 404.1521.  The ability to do basic work activities refers to "the abilities and aptitudes necessary to do most jobs."  *Id.* § 416.922(b).  This severity assessment at step two is intended "to screen out *de minimis* claims."  *Dixon v. Shalala,* 54 F.3d 1019, 1030 (2d Cir. 1995).  Accordingly, "[a] finding of 'not severe' should be made if the medical evidence establishes only a slight abnormality which would have no more than a minimal effect on an individual's ability to work."  *Mezzacappa v. Astrue*, 749 F. Supp. 2d 192, 205 (S.D.N.Y. 2010).

The medical record here reveals that Dr. Libby Sukoff, an ophthalmologist, had been treating Giuliano since at least 1988.[4]  In a letter dated January 23, 2012, Dr. Sukoff stated

---

[4] Two of Dr. Sukoff's handwritten letters identified a treatment history dating back to 1988, *see* Tr. 321, 354, while another indicated 1985.  *Id.* at 383.

7

that Giuliano suffered from a degenerative corneal condition called keratoconus, as well as "dry eye syndrome, floaters and retinal change," symptoms that were "typical for" that condition.  *Id.* at 354.  That letter indicated that Giuliano's vision was "controlled by contact lenses"; his "best corrected visual acuity" with contact lenses was 20/20 in the right eye and 20/25 in the left eye.  *Id.*

The ALJ also considered medical records regarding the eye treatment Giuliano received while incarcerated from 2012 to 2016.  Upon his surrender in January 2012, he reported no disabilities at an initial (intake) medical examination.  *Id.* at 406.  That physical examination revealed normal findings in his eyes.  *Id.* at 407-08.  Follow-up eye examinations in September 2013 indicated visual acuity of 20/25 in the right eye and 20/20 in the left eye with corrective lenses.  *Id.* at 505.  A routine annual eye examination in December 2014 showed that Giuliano had visual acuity of 20/40 and 20/25.  *Id.* at 513.  The report for that examination noted that Giuliano "describe[d] some difficulty reading," but was "doing well, tolerating [his contact lenses] well" and had "[g]ood" visual acuity.  *Id.*  Additional records from the correctional facility reflect that Giuliano requested contact lens solution on September 25 and November 11, 2014, but refused his annual ophthalmology consultation on November 25, 2015.  *Id.* at 523, 525, 577-78.

8

The ALJ also heard medical expert testimony from Dr. Michael Betten, a board-certified ophthalmologist. *Id.* at 54-59. Dr. Betten reviewed Giuliano's prior visual acuity measurements, including the December 2014 examination report, and observed that his corrected visual acuity ranged from 20/20 to 20/60 during the relevant period. *Id.* at 57-58. When asked about Giuliano's ability to read, Dr. Betten testified that, based on the records, he could read "J-1" font, which was similar to newspaper print. *Id.* at 58.

Based on this and other available evidence, the ALJ properly determined that Giuliano failed to meet his burden to show that his visual impairment was severe prior to December 31, 2015, his date last insured. Dr. Sukoff's 2012 treatment notes indicated that his eye condition had been "controlled by contact lenses." *Id.* at 354. ALJ Grossman explicitly noted that Giuliano's December 2014 eye examination was the "most recent" one as to the relevant period, at which the consulting ophthalmologist recorded "[g]ood" visual acuity of 20/40 and 20/25. *Id.* at 15, 513. Indeed, Giuliano refused his annual ophthalmology consultation on November 25, 2015, *see id.* at 454, 577-78, which likely would have been among the most probative evidence as to the nature and extent of his impairment prior to December 31, 2015.

9

The ALJ's conclusion is also supported by the fact that, while the records suggest Guiliano has had keratoconus since at least 1988, he worked as an attorney until 2010 (when he was criminally charged). Giuliano has offered no evidence that his eye problems worsened between 2010 and 2014. Indeed, he does not contest the evidence that he was gainfully employed as an attorney, while suffering from vision issues, until 2010. *Id.* at 107; *see also id.* at 230. That fact supports the ALJ's findings that Giuliano's visuals impairments were not severe. *See Reynolds v. Colvin*, 570 F. App'x 45, 47-48 (2d Cir. 2014) (fact that claimant worked during decade between initial findings of medical issue and alleged onset date was a "circumstance making it difficult to infer severe impairment from the earlier records").

Moreover, even if the ALJ erred in finding Giuliano's visual impairments to be non-severe — which he did not — any such error would still be harmless in this case. "Where an ALJ excludes certain impairments from the list of severe impairments at the second step, any such error is harmless where the ALJ identifies other severe impairments such that the analysis proceeds and the ALJ considers the effects of the omitted impairments during subsequent steps." *Calixte v. Colvin*, No. 14-CV-5654, 2016 WL 1306533, at *23 (E.D.N.Y. Mar. 31, 2016) (collecting cases); *see, e.g., O'Connell v. Colvin*, 558 F. App'x

10

63, 65 (2d Cir. 2014) (any error in the ALJ's exclusion of the claimant's knee injury as a severe impairment was harmless because the ALJ identified other severe impairments and considered the knee injury in subsequent steps); *Reices-Colon v. Astrue*, 523 F. App'x 796, 798 (2d Cir. 2013) (any error in the ALJ's exclusion of anxiety and panic attacks was harmless because the ALJ identified other severe impairments and considered these conditions in subsequent steps). This is because an ALJ must evaluate both severe and non-severe impairments in determining a claimant's RFC. *See* 20 C.F.R. § 404.1545(a)(2) (requiring ALJs to consider "all" medically determinable impairments, including those "that are not 'severe,'" in determining an RFC); *cf. Parker-Grose v. Astrue*, 462 F. App'x 16, 18 (2d Cir. 2012) (ALJ's finding that mental impairment was non-severe was not harmless because the ALJ failed to account for it in the RFC determination).

Such is the case here. As discussed above, the ALJ evaluated Giuliano's treatment records, medical expert opinions, and other available evidence to conclude that his keratoconus was not a severe impairment during the relevant period. Tr. 12-13. The ALJ then considered this evidence regarding his visual impairments again, in detail, as a part of the RFC determination at step three — ultimately concluding that his eye issues did not prevent him from performing "the full range of sedentary

work" between December 31, 2014 and December 31, 2015. *Id.* at 16-19. As a result, the conclusion that Giuliano's visual impairments would be harmless, even if it were erroneous. *O'Connell*, 558 F. App'x at 65; *Reices-Colon*, 523 F. App'x at 798.

Guiliano's challenges to the ALJ's findings are therefore unpersuasive. He asserts, for example, that the ALJ improperly discounted his reported difficulties with reading and headaches caused by his contact lenses. Pl. Mem. 9-10. At the June 24, 2020 hearing, Giuliano testified that his keratoconus caused "blurred, "double," and "distorted vision." Tr. 56. He further claimed that he "can't read normally"; wearing contact lenses helped with reading "a little bit" but also "cause[d] headaches" and "bother[ed]" his eyes, and reading glasses did "not help" at all. *Id.* at 56-57, 59. But Giuliano's complaints as to his then-present conditions, as of June 2020, shed little (if any) light on the severity of his impairment years earlier in the relevant December 2014 to December 2015 period. *See, e.g.*, *Papp v. Comm'r of Soc. Sec.*, No. 5-CV-5695, 2006 WL 1000397, at *17 (S.D.N.Y. Apr. 18, 2006) (discounting evidence that postdated the date last insured and collecting cases). In any event, the ALJ explicitly considered this testimony, concluding that it was inconsistent with the medical record and Dr. Betten's opinion. *Id.* at 12-13. Specifically, ALJ Grossman

noted that the record was "devoid of treatment for chronic headaches," and that Dr. Betten could not "make a medical correlation" between the claimant's corrective lenses and his alleged headaches. *Id.* at 12-13; *see id.* at 59. The ALJ did not err in reaching this conclusion.

Giuliano's contention that the ALJ failed in his duty to develop the record likewise falls short. He asserts that the ALJ should have obtained additional information from Dr. Sukoff regarding the severity and history of his visual impairments, "particularly prior to the [date last insured]." Pl. Mem. 11-12. While the ALJ has a general "duty to investigate and develop the facts," *see Moran v. Astrue*, 569 F.3d 108, 113 (2d Cir. 2009), he "is required affirmatively to seek out additional evidence only where there are 'obvious gaps' in the administrative record." *Eusepi v. Colvin*, 595 F. App'x 7, 9 (2d Cir. 2014) (quoting *Rosa v. Callahan*, 168 F.3d 72, 79 & n.5 (2d Cir. 1999)). In other words, the ALJ has no duty "to develop the record any further when the evidence already presented is 'adequate for the ALJ to make a determination as to disability." *Janes v. Berryhill*, 710 F. App'x 33, 34 (2d Cir. 2018) (quoting *Perez v. Chater*, 77 F.3d 41, 48 (2d Cir. 1996)).

While Giuliano refers generally to "important information" that Dr. Sukoff "was in a position" to provide, Pl. Mem. 11, he does not specifically identify any obvious gaps in

13

the medical record as to his visual impairments. Nor is it clear what additional evidence Dr. Sukoff could have offered, given Giuliano's incarceration from 2012 to 2016 — which covered the entire relevant period of time between his disability onset date in 2014 and his date last insured in 2015. He does not assert, and nothing in the record reflects, that Dr. Sukoff continued to meaningfully treat or examine him during that time. Giuliano's argument, moreover, ignores the ALJ's affirmative efforts to develop the facts in this case. Indeed, the ALJ paused the initial hearing in January 2020 and issued a subpoena to the correctional facility for his medical records; considered those records; and then obtained medical expert testimony from an ophthalmologist at a supplemental hearing in June 2020. Tr. 55-59, 108-13, 442.

In short, the evidence supporting the ALJ's findings as to Giuliano's visual impairments was more than sufficiently substantial, and the ALJ committed no legal error.

**B.   Musculoskeletal Impairments**

Giuliano also contends that the ALJ erred in discounting the severity of his shoulder impairments, which render him "unable to perform the manual requirements of sedentary work." Pl. Mem. 12-14. At step three, the ALJ concluded that Plaintiff's shoulder impairments did not meet or medically equal the criteria of a Listed Impairment. Tr. 13-14.

14

Giuliano asserts that the bilateral shoulder tear did "meet the criteria of the Listing of Impairments," Pl. Mem. 12, and that in concluding otherwise, the ALJ improperly placed his own lay opinion over that of the medical expert, Dr. Jeff Hansen.

As with step two, a claimant bears the burden of proof at step three. *See Talavera v. Astrue*, 697 F.3d 145, 151 (2d Cir. 2012). To show that his medical conditions meet or equal a Listed Impairment, he must show that all criteria in the listing are met. *See Sullivan v. Zebley*, 493 U.S. 521, 531 (1990). "An impairment that manifests only some of those criteria, no matter how severely, does not qualify." *Id.* at 530.

The ALJ considered whether Giuliano's shoulder impairments met the requirements of Listing 1.02B, which refers to "[m]ajor dysfunction of a joint." That Listing requires a claimant to have a "gross anatomical deformity"; "chronic joint pain"; "stiffness with signs of limitation of motion or other abnormal motion of the affected joint(s)"; and "findings on appropriate medically acceptable imaging" of the affected joint(s), combined with: "[i]nvolvement of one major peripheral joint in each upper extremity (*i.e.*, shoulder, elbow, or wrist-hand), resulting in inability to perform fine and gross movements effectively." 20 C.F.R. pt. 404, subpt. P, app. 1, § 1.02(B) (effective through Apr. 1, 2021). An inability to perform fine and gross movements under 1.00B2c, in turn, entails

15

"an extreme loss of function of both upper extremities; i.e., an impairment(s) that interferes very seriously with the individual's ability to independently initiate, sustain, or complete activities." *Id.* pt. 404, subpt. P, app. 1, § 1.00(B)(2)(c) (effective through Apr. 1, 2021).

Substantial evidence supports the ALJ's conclusion that Giuliano's shoulder impairments did not meet that listing in 2015. Tr. 13-19. The ALJ acknowledged Giuliano's June 2020 hearing testimony that his shoulder pain began in 2012 while he was still incarcerated, but correctly observed that "the earliest diagnostic examination revealing a shoulder tear did not take place until" August 23, 2016 — nearly eight months "after the claimant's date last insured." *Id.* at 14, 378–81. "While evidence postdating the date last insured is not categorically irrelevant," that timing is "certainly a relevant factor," and the ALJ here "did not err in discounting it on that basis." *Gibbons v. Comm'r of Soc. Sec.*, No. 18-CV-311, 2019 WL 4199786, at *6 (W.D.N.Y. Sept. 5, 2019); *see Vilardi v. Astrue*, 447 F. App'x 271, 272 (2d Cir. 2012) (plaintiff's reliance on medical evidence demonstrating a worsening of her condition after the date last insured was of "little value").

Although Giuliano suggests the August 2016 MRI results should be dispositive, the ALJ properly considered that scan in the context of the medical evidence (and lack thereof) as a

16

whole in evaluating his impairment as of the date last insured. As the ALJ pointed out, the record contained no objective medical evidence, "specifically physical examinations," documenting any shoulder problems prior to Giuliano's date last insured. Tr. 13. While, at the June 2020 hearing, Giuliano pointed to his incarceration to explain a lack of treatment, *see id.* at 83, correctional facility medical records from November and December 2015 omit any mention of shoulder issues, despite documenting other health problems such as hiatal hernia, GERD, and bladder dysfunction. *Id.* at 391, 447; *see Salvaggio v. Apfel*, 23 F. App'x 49, 51 (2d Cir. 2001) (the "lack of independent medical evidence" prior to the claimant's date last insured supported finding that she was not disabled).

Other evidence post-dating Giuliano's date last insured likewise supports the ALJ's findings. At a May 12, 2016 examination, the neurologist Dr. Stephen Kulick observed that Giuliano "move[d] his arms and legs equally well." Tr. 342. At follow-up appointments on May 16 and June 13, 2016 (for sleep evaluation), the examining doctor Dr. Stephen Lin noted that Giuliano had "5/5 strength in the deltoids, biceps, triceps" and the "upper limbs," among other things, as well as normal gait. *Id.* at 338-39. Records from 2018 and onward — now years after the date last insured — indicate that Giuliano was experiencing shoulder problems, but still do not demonstrate that he had a

17

Listed Impairment back in 2015. At a June 21, 2018 appointment, for example, Dr. Joseph Giovinazzo reviewed the results of an MRI of Giuliano's left shoulder conducted days earlier. *Id.* at 322-24. While noting that the MRI revealed "a massive tear," Dr. Giovinazzo also observed that Giuliano had only "occasional pain in his shoulder," a "full range of motion," and "good but not full strength." *Id.* at 324. Based on a review of the record as a whole, the ALJ's conclusion that Giuliano's shoulder impairments did not meet or equal a medical listing as of December 31, 2015 was supported by substantial evidence.

The ALJ also evaluated the testimony of Dr. Hansen, an orthopedic medical expert. The ALJ rejected Dr. Hansen's view "[t]o the extent that Dr. Hansen testified that the claimant met/equaled any orthopedic listing prior to the [date last insure]." *Id.* at 19. This was so, the ALJ explained, because "the medical records contradict Dr. Hansen's opinion." *Id.* A review of the hearing transcript, however, indicates that Dr. Hansen's conclusions that Giuliano met the 1.02B Listing — as clarified by the ALJ's questioning — were based on the 2016 and 2018 medical records. *Id.* at 72-73, 80-82. Critically, Dr. Hansen conceded (on multiple occasions) that there was not enough evidence in the record to allow him to make that determination as of the date last insured. *Id.* at 64, 73-74, 80-82. Thus, contrary to Giuliano's assertion, *see* Pl. Mem. 13,

18

the ALJ did not substitute his lay opinions for that of a medical expert.  Indeed, the ALJ's conclusion that his shoulder issues did not reach or medically equal a listing relied in part on Dr. Hansen's findings.  Tr. 15–19.

Giuliano's suggestion that the ALJ evinced bias against him — by "browbeat[ing]" a medical expert "into recanting" and being "surprisingly open in voicing his hostility to Dr. Hansen," *see* Pl. Mem. 13 — is without merit.  At the hearing, the ALJ acted appropriately, as the trier of fact, in questioning Dr. Hansen and clarifying his opinion as to what the evidence showed before and after December 31, 2015 — the critical date in this case.  The record provides no other indication of any bias.  Without something grounded in the record, Giuliano's allegations cannot sustain a claim that the ALJ's bias denied him a fair hearing.  *See Whitfield v. Astrue*, 476 F. App'x 408, 409 (2d Cir. 2012) (rejecting bias argument because "nothing in the record suggests that the ALJ's decision was a product of any bias"); *see also Reddy v. Commodity Futures Trading Comm'n*, 191 F.3d 109, 119 (2d Cir. 1999) (claimant must show that the ALJ expressed a "deep-seated favoritism or antagonism that would make a fair judgment impossible").

## IV.  Conclusion

For the reasons set forth above, the Court grants the Commissioner's motion for judgment on the pleadings and denies

19

Giuliano's motion.  The Clerk of Court is respectfully requested to enter the judgment and close the case.

      SO ORDERED.


                                    /s/ Eric Komitee
                                ERIC KOMITEE
                                United States District Judge


Dated:    September 25, 2023
           Brooklyn, New York